UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOAN T. KLOTH–ZANARD,<br>        *Plaintiff*, | Civil No. 3:09cv606 (JBA) |
| *v.* | |
| AMRIDGE UNIVERSITY,<br>        *Defendant*. | June 22, 2012 |

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Joan Kloth–Zanard filed this suit against Amridge University alleging breach of contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), promissory estoppel (Count Three), intentional misrepresentation (Count Four), negligent misrepresentation (Count Five), negligent infliction of emotional distress (Count Six), unjust enrichment (Count Seven), and a violation of the Connecticut Unfair Trade Practices Act (Count Eight). Defendant Amridge University moves [Doc. # 107] for summary judgment on all counts. For the reasons that follow, Defendant's motion will be granted.

I.      Undisputed Facts

Plaintiff Joan Kloth–Zanard is a citizen and resident of the State of Connecticut, and Defendant is an institution of higher education located in Montgomery, Alabama. Amridge offers "distance learning" or "online education" to students, and in late 2001, Plaintiff contacted Amridge to discuss its distance learning programs for Master's degrees in Marriage and Family Therapy and Professional Counseling. Plaintiff began classes in Amridge's distance learning program in January 2003.

As part of the distance learning program at Amridge, Plaintiff was aware that completing a "clinical program" was a required component of attaining a master's degree in counseling. (*See* Pl.'s Dep., Ex. B to Def.'s Loc. R. 56(a)1 Stmt at 30.) Plaintiff also knew that the State of Connecticut required several hundred hours of clinical counseling in order to become licenced. (*Id.* at 31.) When Plaintiff was considering enrolling in Amridge's distance learning program, Martin Cox, a representative of Amridge, spoke with her by telephone and told her that she was expected to find the site for her clinical training, and that Amridge would "assist" her in making sure she completed her clinical hours. (*Id.* at 58:13–16.) Plaintiff testified at her deposition that:

> I had asked him how the clinical . . . worked. And he just said yes, we assist you, you find it in Connecticut. You find something close to you in Connecticut. I think the words were, you do your training out of Connecticut, but we'll assist you in making sure you get through your clinical.

(*Id.* at 59:7–14.)

Plaintiff followed up this phone conversation by emailing Mr. Cox with additional questions. (*See id.* at 58:18–19.) He told her that Amridge was "candidacy eligible" with the Commission on Accreditation for Marriage and Family Therapy Education ("COAMFTE"), and that Amridge expected "full candidacy" by late 2002 and "full accreditation" around 2005. (*See* Sept. 13, 2002 Email from Martin Cox to Plaintiff, Ex. E to Def.'s 56(a)1 Stmt at Kloth000000004.) Plaintiff testified that she knew that if a school is not COAMFTE certified, "it would take me a little longer and the state longer to approve me because I would have to provide so much documentation." (Pl.'s Dep. at 72:24–73:2.)

On February 4, 2003, one month into Plaintiff's coursework at Amridge, Plaintiff participated in an online class, "Ethics and Professional Identity," in which the professor

2

advised the students that they needed to email him and ask for an application for clinical training "four semesters prior to when they expect to graduate." (Deposition of Dr. Wayne Perry, Ex. A to Def.'s 56(a)1 Stmt at 44–46; DVD, Ex. G to *id.*)  Dr. Perry told the students in the class that in response to the email application request, he would send them the current clinical training handbook with all of the information they would need to know about clinical training. (DVD of online Ethics & Professional Class, Ex. G to Def.'s 56(a)1 Stmt.) Dr. Perry also mentioned that all state licencing boards required that clinical training be completed face–to–face, and that he would help them "in any way" he could. (*Id.* at 2:22.) Plaintiff testified that she knew it was her responsibility to find the site where she could do her clinical work, but she understood that the University would assist her if she was having trouble procuring a placement. (*See* Pl.'s Dep. at 91–95.) Ms. Kloth–Zanard was never told that her efforts to obtain a clinical placement would take a specific period of time. (*Id.* at 198.)

Plaintiff contacted Dr. Perry about commencing her clinical site search in March 2004. (*See* Ex. H to Def.'s 56(a)1 Stmt at AMU001497–1499.) In a series of emails with Dr. Perry, Ms. Kloth–Zanard described her requirements for her clinical placement: "because of the time constraints and travel issues in combination with my daughter's schedule, finding a place could be a big issue. It either has to be in my local town or it has to be in the town or near the town that my daughter does her ice skating training." (March 21, 2004 Email from Joan Kloth–Zanard to Dr. Wayne Perry, Ex. I to Def.'s 56(a)1 Stmt.) Dr. Perry advised Plaintiff to "apply to several places. Almost no one is accepted by the first place to which they apply," and cautioned that Plaintiff should "be prepared for a lot of turn–downs." (March 21, 2004 Email from Dr. Perry to Joan Kloth–Zanard, Ex. J to Def.'s 56(a)1 Stmt.)

3

On March 23, 2004, Plaintiff emailed Dr. Perry, stating that she had contacted "over 25 people and places for internship/supervision," all to no avail. (Ex. K to Def.'s 56(a)1 Stmt.)

On March 31, Plaintiff emailed Dr. Perry to advise him that she had a potential contact, and he encouraged her to have this contact, Judy Gardner, email him. (Ex. M to Def.'s 56(a)1 Stmt.) Dr. Perry testified at his deposition that he never heard from Judy Gardner. (*See* Perry Dep. at 108–10.) Plaintiff attests that the committee that had interviewed her for the placement was "uncomfortable with the distance learning arrangement," particularly because the contact with Defendant was limited to email. (*See* Kloth Dec. ¶ 9.) Dr. Perry testified that he reviewed her list of clinical training site options, and made efforts to assist Plaintiff's search with a few phone calls and that he "thought [he] had a site lined up for her." (Perry Dep. at 55–56.)

Dr. John White, another administrator at Amridge, also attempted to assist in Plaintiff's site placement search. Dr. White notified Plaintiff via phone and email that he had located an agency that was interested in speaking with her, and that he had made an effort to contact the director of Head Start on her behalf. (*See* Dec. 12 2004 Email from Dr. White to Joan Kloth–Zanard, Ex. O to Def.'s 56(a)1 Stmt.) Plaintiff left several messages for the contact that Dr. White recommended to her. (*See id.*)

In spite of this record, Ms. Kloth–Zanard disputes that Drs. Perry and White assisted her, and states that she is aware of Dr. Perry and Dr. White each placing only one call on her behalf. (*See* Pl.'s Dep. at 95–96.) Plaintiff never located a clinical training program, and maintains that Defendant's representatives' "minimal efforts" to assist her in locating a program did not satisfy Defendant's obligations. (*See* Pl.'s Loc. R. 56(a)2 Stmt ¶ 6.)

4

II.     Discussion[1]

Defendant moves for summary judgment on all counts, arguing first that under Connecticut law, a subjective critique of how an educational program is administered is not actionable, either in tort or in contract.[2] Defendant also asserts that Plaintiff has not pointed to any specific promises that Defendant did not fulfill, and that her claims are time–barred under the applicable statute of limitations.[3]

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir.2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000).

[2] Though Plaintiff also alleges that Defendant's failure to make "reasonable" or "meaningful" efforts to find her a clinical training site was in part motivated by the fact that Plaintiff is Jewish, Plaintiff has pointed to no specific evidence in the record to support this claim, nor has Plaintiff alleged a separate claim of religious discrimination. Defendant also notes that Plaintiff does not address the issue of religious discrimination at all in her opposition brief, and that her Complaint does not plead a cause of action for religious discrimination. As discussed at oral argument, the only evidence in the record as to the issue of religious discrimination is Plaintiff's unsubstantiated and subjective belief that she was treated differently because of her religion.

[3] The Court determined in ruling on Defendant's motion to dismiss in 2010 that Plaintiff's claims were not time–barred in light of the doctrine of equitable tolling. (*See* Bench Ruling Tr. [Doc. # 62] 66:17–67:13; 68:6–14.) Specifically, the Court held:

> Here, because Plaintiff timely sued but in the wrong forum, the forum in which she then lived, she was *pro se*, the Third Circuit said transfer was an option, and her motion for transfer was initially, but not ultimately, successful, fairness dictates tolling the statute of limitations for the pendency of the action in Delaware such that neither her tort claims nor her CUTPA claim is time barred.

A.      Breach of Contract Claims (Counts I, II, III, VII)

Defendant contends that under Connecticut law, causes of action alleging breach of contract for educational services are generally not recognized, and argues that four of the eight causes of action in Plaintiff's complaint allege a failure on the part of Defendant to provide Plaintiff with an adequate education. Plaintiff contends that there are issues of fact relevant to whether her allegations fall within one of the recognized exceptions to the holding in *Gupta v. New Brit. Gen. Hosp.*, 239 Conn. 574, 591 (1996), and that summary judgment should be denied.

In *Gupta*, the Connecticut Supreme Court held that the tort of "educational malpractice" is generally not cognizable, and that the "[t]he jurisprudential considerations that shed doubt on the viability of the tort of educational malpractice also inform our analysis of a contract claim based on inadequate educational services." 239 Conn. at 591. Noting that "[i]t is as a result of these considerations that contract claims challenging the overall quality of educational programs have generally been rejected, *id.* at 592, the Supreme Court in *Gupta* defined "at least two exceptions" to this general rule:

> The first would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field. . . . The second would arise if the educational institution failed to fulfil a specific contractual promise distinct from any overall obligation to offer a reasonable program.

*Id.* at 593–94 (internal quotations omitted).

In opposition, Plaintiff argues that she is entitled to a jury's determination of whether Amridge's educational program failed in a fundamental respect, asserting that the failure of

---

(*Id.* at 68:6–14.) Defendant has not presented the Court with new arguments as to why the Court's analysis should be altered.

6

Defendant's program is "objectively measurable." (Pl.'s Opp'n [Doc. # 115] at 12.) Plaintiff cites to *Cullen v. Univ. of Bridgeport*, No. CV-02-0396010, 2003 WL 23112678 (Conn. Sup. Dec. 10, 2003), in which Judge Wolven of the Fairfield Superior Court distinguished between "objectively measurable" failures, such as "the number of days/hours required to complete a prescribed course of study," or a "failure to perform five specific commitments [the university] had made to the plaintiff," *Cullen*, 2003 WL 23112678, at *3, with "inquiry into subjective aspects of a program."[4] As evidence of "objectively measurable" failure, Plaintiff points to the fact that Amridge "provided neither a site placement nor supervision. . . . And when Kloth struggled to find a site and supervisor on her own, Amridge refused to engage in assisting her to procure a clinical training site, . . . that Amridge completely refused to create a rapport with potential supervisors." (Pl.'s Opp'n at 12 (citing Pl.'s Dep. at 235:4–10).)

---

[4] *Cullen* relied on two out–of–state cases for examples of an "objectively measurable failure": In *Ross v. Creighton University*, 957 F.2d 410 (7th Cir.1992), the Seventh Circuit recognized a student's breach of contract claim against the defendant university for failure to perform five specific commitments it had made to the plaintiff. The court determined that "[t]o adjudicate such a claim, the court would not be required to determine whether [the defendant] had breached its contract with [the plaintiff] by providing deficient academic services ... [but][r]ather, its inquiry would be limited to whether the University had provided any real access to its academic curriculum at all." In *Wickstrom v.. North Idaho College*, 111 Idaho 450, 452 n. 1 (1986), the court defined "fundamental failure" to include "the number of days/hours required to complete a prescribed course of study and other objective criteria in a course's presentation." *Cullen* reasoned that *"Wickstrom* and *Ross* demonstrate that for a breach of contract claim to fall within the first *Gupta* exception, the 'alleged fundamental failure of the educational program must be objectively measurable. A claim that invites inquiry into subjective aspects of a program, such as quality or methodology implicates the policy considerations the court discussed in *Gupta v. New Britain Hospital*.'" *Cullen v. Univ. of Bridgeport*, 2003 WL 23112678, at *3 (internal citations omitted).

Plaintiff also argues that the summary judgment record is sufficient to support the second *Gupta* exception—that Amridge made a specific promise to Kloth to assist in the procurement of a clinical placement. Plaintiff points to "two specific, identifiable promises": (1) that Amridge would assist her in securing a clinical training site and supervisor, and (2) that Amridge was seeking accreditation from COAMFTE and "would be accredited by the time of her expected graduation." (*Id.* at 13.) Plaintiff likens these promises to the promises made in *Ross v. Creighton Univ.*, in which the court found that a plaintiff had stated an actionable claim in alleging that the University had made a specific promise to the plaintiff to provide tutoring and then failed to provide any such services. *Ross v. Creighton*, 957 F.2d at 417.

The factual record, viewed in the light most favorable to Plaintiff as required, contains no evidence showing either that Amridge's academic program failed in some fundamental respect, or that Amridge failed to fulfill a specific contractual promise to Ms. Kloth–Zanard. As to the first exception, while clinical training was a required curriculum component, Plaintiff acknowledges that she knew she had to find her own clinical training site. (*See* Pl.'s Dep., Ex. B to Def.'s 56(a)1 Stmt at 58:13–16.) Plaintiff described what Mr. Cox had told her, "you find the site in your home town *and we [Amridge] assist you* in making sure you get that part of your training done." (*Id.* (emphasis added).) Further, Plaintiff acknowledges that Drs Perry, White, and Bertram made some attempt to help her with finding placement—both by placing calls on her behalf, and by making specific recommendations to her regarding people and programs to contact. (*See id.* at 98:21–23, 212:10–15; *see* May 18, 2005 Email from Dr. Dale Bertram to Plaintiff, Ex. Q to Def.'s 56(a)1 Stmt; July 19, 2005 Email from Dr. Dale Bertram to Plaintiff, Ex. R to Def.'s 56(a)1 Stmt; July

8

22, 2005 Email from Dr. Dale Bertram to Plaintiff, Ex. S to Def.'s 56(a)1 Stmt.) Although Plaintiff may dispute the number of phone calls each made on her behalf (*see, e.g.*, Pl.'s 56(a)2 Stmt), she does not dispute that phone calls were made and Amridge faculty attempted to provide some assistance. Thus, her allegations necessarily constitute a subjective critique of the *manner* in which Amridge's faculty and administration assisted her in finding a placement. This, on its own, falls short of a "fundamental failure" of the type described in *Gupta*, such as "not offering *any of the courses necessary* to obtain certification in a particular field." *Gupta*, 239 Conn. at 593 (emphasis added).

As to the second exception, Plaintiff has failed to point to any specific, contractual promise made by Amridge with respect to her educational program. To constitute a "specific contractual promise," the promise on which a plaintiff relied must have been precise and based on specific contractual terms or provisions. *Faigel v. Fairfield Univ.*, 75 Conn. App. 37, 42 (2003). Mr. Cox's discussion with Plaintiff in which he promised that Amridge would "assist" students "in making sure you get that part of your training done," (*see* Pl.'s Dep. at 58:14–15), does not amount to a "specific promise" as to the extent or nature of assistance that would be provided. Similarly, Dr. Perry's general statement that he would help students "in any way" he could (*see* DVD at 2:22) to procure a clinical site placement is not a "specific contractual promise," and Plaintiff's record cannot reasonably support a jury finding that Defendant's conduct amounted to a failure to follow through on the promise of assistance at all. *See Ross v. Creighton Univ.*, 957 F.2d at 417 ("In these cases, the essence of the plaintiff's complaint would not be that the institution failed to perform adequately a promised educational service, *but rather that it failed to perform that service at all*. Ruling on this issue would not require an inquiry into the nuances of educational processes and

theories, but rather an objective assessment of whether the institution made a good faith effort to perform on its promise.") (emphasis added); *compare Faigel*, 75 Conn. App. at 42 ("an alleged promise that 'the plaintiff would be allowed 'many credits' from her prior engineering studies'" does not qualify as a "specific contractual promise" under *Gupta*), *with Morris v. Yale Univ. Sch. of Medicine*, No. 5cv848(JBA), 2006 U.S. Dist. LEXIS 15692, at *15–16 (plaintiff's claims "fall within the second [*Gupta*] exception because plaintiff has alleged that "the provision of the student handbook granting a student opportunities to pass the examination before dismissal is a distinct contractual promise independent of the defendant's obligation to offer a reasonable educational program.").

> B.      Tort Claims (Counts IV, V, VI, and VII)

Plaintiff's remaining claims sound in tort. As a general matter, the "basic legal relation between a student and a private university or college is contractual in nature. The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the *contract.*"•*Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992) (citing *Zumbrun v. University of Southern California*, 25 Cal. App.3d 1, 101 Cal. Rptr. 499, 504 (1972) (collecting cases from numerous states) (emphasis added)); *see also Johnson v. Schmitz*, 119 F.Supp. 2d 90, 94 (D. Conn. 2000).

> *1.      Intentional and Negligent Misrepresentation (Counts IV and V)*

The essential elements of an action in intentional misrepresentation are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. *Updike, Kelly & Spellacy, P.C. v. Beckett*, 269 Conn. 613, 643 (2004). An action for negligent misrepresentation requires the plaintiff to

establish (1) that the defendant made a misrepresentation of fact, (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result. *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006).

Plaintiff bases her misrepresentation claims on the allegations that Amridge intentionally or negligently failed to disclose that she would be required to arrange her own site for supervised clinical training and made representations about accreditation that it knew or should have known were untrue. (*See* Third Am. Compl. [Doc. # 44] ¶¶ 55; 61.) The record lacks any evidence that at the time Defendant made the representations about accreditation or about assistance with her clinical placement, that Defendant knew, or should have known, that such representations were false. The record shows that Defendant represented that candidacy for accreditation was "expected" by late 2002, and full accreditation was "expected" by 2005. (Ex. E to Def.'s 56(a)1 Stmt.) Nothing in Plaintiff's communications with Mr. Cox would suggest that accreditation was represented as a certainty, or that Mr. Cox knew or should have known that there was no legitimate basis for these "expectations." *See 456 Corp. v. United Natural Foods, Inc.*, 3:09CV1983(JBA), 2011 WL 87292, at * 3 (D. Conn. Jan. 11, 2011) ("However, even though a promise to do an act in the future can be a misrepresentation of fact, only if the promisor knows or should know that the statement is false at the time it is made, i.e. only if the promise is coupled with a present intent not to fulfill it, is that statement a misrepresentation of fact.") (Internal citations omitted). Plaintiff offers no evidence from which a jury could find that Mr. Cox's statement about accreditation expectations was untrue at the time it was made.

As to the representations of assistance with the clinical placement, the record is undisputed that Defendant never stated in any materials provided to Plaintiff that Amridge would provide students with a clinical training site (*see* Pl.'s Aug. 5, 2011 Answers to Def.'s Interrogatories, Ex. D to Def.'s 56(a)1 Stmt at 10), and Dr. Perry told his students, including Plaintiff, on February 4, 2003 that he would help "in any way" he could, but that it was the responsibility of the students to find a clinical site placement (*see* DVD at 2:22). Plaintiff also testified at her deposition that "finding the site and finding a place that I could do it, yes, I understood that . . . made sense" (Pl.'s Dep. at 93:12–14), but that "once I found a place that I might want to use, I did not understand that the school was not even going to make a contact" (*id.* at 93:16–18). Plaintiff clarifies that "[a]fter she heard Perry speak in her class, Kloth knew it was her responsibility to find the site where she could do her clinical work, but she understood that the University would assist her if she was struggling to procure a placement" (*id.* at 15 (citing Pl.'s Dep. at 91–95)). Plaintiff offers no evidence from which reasonable jurors could conclude that Cox or Perry knew that their statements about assistance were untrue when made. Accordingly, Defendant is entitled to summary judgment on Counts IV and V.

### 2.   *Negligent Infliction of Emotional Distress*

In order to succeed on a NIED claim, a plaintiff must establish that (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). In order to maintain a cause of action for negligent infliction of emotional distress, "the plaintiff has the burden

of pleading and establishing that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Morris v. Hartford Courant Co.*, 200 Conn. 676–83 (1986) (Internal quotation marks omitted).

Nothing in the record shows conduct by Defendant that "created an unreasonable risk of causing the plaintiff emotional distress." *Carrol*, 262 Conn. at 444. Here, the record shows that Defendant's employees and administrators made some attempts to assist Kloth in securing a clinical placement. Even if Plaintiff regarded the efforts as paltry or ineffectual, and even if emotional distress to Plaintiff resulted from her failure to find a placement, Plaintiff's evidence cannot support a reasonable inference that Amridge should have realized that its inaction involved an unreasonable risk of causing Plaintiff emotional distress.

3.      *Violation of Connecticut Unfair Trade Practices Act (Count VIII)*

Plaintiff has also alleged that Defendant's conduct, and its "misrepresentations and failures to disclose material facts," constituted a violation of Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b.[5] (Third Am. Compl. ¶¶ 75–78.) At

---

[5] CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b(a). "Trade" and "commerce" are defined in General Statutes § 42-110a(4) as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110g(a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section."

oral argument, Plaintiff's counsel represented that Ms. Kloth–Zanard's CUTPA claim was based on the same conduct that formed the basis of her misrepresentation claims, and thus, if her misrepresentation claim fails, her CUTPA claim also fails.

Here, as discussed above, the essence of Plaintiff's contentions is that Amridge did not provide her with the assistance or support in procuring a clinic placement that she expected to receive, and that Defendant "misrepresented" the extent of the assistance it would provide. As the summary judgment record does not support a misrepresentation claim, it similarly cannot support a claim under CUTPA, and Defendant is entitled to summary judgment on Count VIII.

III.    Conclusion

For the reasons discussed above and notwithstanding Plaintiff's counsel's thoughtful and diligent advocacy, the Court concludes that the record cannot support Plaintiff's claims. Accordingly, Defendant's motion for summary judgment is GRANTED. The Clerk is directed to close the case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of June, 2012.